UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CRYSTAL TRAHAN o/b/o                     DOCKET NO. 6:12-cv-00989
T.T., a minor child

VERSUS                                   JUDGE DOHERTY

MICHAEL J. ASTRUE,                       MAGISTRATE JUDGE HANNA
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

with instructions to award benefits.

### BACKGROUND

On February 6, 2007, Crystal Trahan filed an application for Supplemental

Security Income benefits[1] for her daughter, T.T., who was born on September 6,

2000,[2] and was, at the time of the application, just six years old.  The application for

benefits alleged a disability onset date of October 1, 2006.[3]  A contemporaneous

---

[1]      Rec. Doc. 7-1 at 175.

[2]      Rec. Doc. 7-1 at 36, 175.

[3]      Rec. Doc. 7-1 at 175.

function report[4] and disability report[5] alleged that T.T. had attention deficit disorder for which she had been prescribed Strattera, had a sort attention span, started activities then moved on to something else, tended to be violent, hit her friends, rebelled, did not do what she was told, was in special education classes, and was being counseled at New Way Mental Health in Ville Platte, Louisiana.

A change in the severity of T.T.'s symptoms prompted a request to move the onset date to January 12, 2008.[6]  On the amended onset date, T.T. was seven years old.  The revised onset date is significant because it coincides with T.T.'s having found her older brother hanging in their grandmother's backyard, the victim of what has been ruled a suicide.[7]  The record is clear that her brother's suicide intensified T.T.'s behavior problems.[8]

Upon initial determination, the Commissioner denied the application on June 28, 2007.[9]  A hearing was held on October 16, 2008 before Administrative Law Judge

---

[4]     Rec. Doc. 7-1 at 188-197.

[5]     Rec. Doc. 7-1 at 218-227.

[6]     Rec. Doc. 7-1 at 30.

[7]     Rec. Doc. 7-1 at 48, 79.

[8]     Rec. Doc. 7-1 at 49, 73, 84, 86, 329.

[9]     Rec. Doc. 7-1 at 306-312.

("ALJ") Ronald L. Burton.[10]  At that time, T.T. was eight years old, and she and her mother appeared at the hearing without representation.  The ALJ rendered an unfavorable decision on January 27, 2009.[11]  On March 5, 2010, the Appeals Council vacated the unfavorable decision and remanded the matter with instructions for further action including a supplemental hearing.[12]  A second hearing was held on September 9, 2010, when T.T. was ten years old, before ALJ Joan H. Deans.[13]  A second unfavorable decision was rendered on November 19, 2010.[14]  Mrs. Trahan requested Appeals Council review, and the Appeals Council denied her request on March 2, 2012.[15]  Accordingly, the ALJ's decision of November 19, 2010 is the Commissioner's final decision for purposes of judicial review.[16]

Mrs. Trahan now argues that T.T.'s mental health issues qualify her for Social Security benefits.

---

[10]    A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 67-94.

[11]    Rec. Doc. 7-1 at 99-104.

[12]    Rec. Doc. 7-1 at 16, 32.

[13]    A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 26-65.

[14]    Rec. Doc. 7-1 at 16-25.

[15]    Rec. Doc. 7-1 at 5.

[16]    42 U.S.C. § 405(g).

The first reference to behavior problems in the medical records made a part of the record of this proceeding is Dr. Charice Hebert's treatment note of December 20, 2005,[17] when T.T. was five years old.  Dr. Hebert is T.T.'s primary care physician. T.T. was described by the doctor as "sassy," and the history given to Dr. Hebert included anger, behavior problems at school, and a note from school indicating that T.T. is "out of control."  The doctor's plan was to call T.T.'s teacher.

On January 10, 2006, Dr. Hebert again saw T.T. with regard to behavior problems.  Reference is made to an ADHD[18] evaluation, and Concerta was prescribed.[19]

Dr. Hebert again saw T.T. with regard to ADHD and behavior problems on August 1, 2006.[20]  It was noted that T.T. had failed kindergarten and had not taken the previously prescribed medication.  Concerta was again prescribed.  Over time, several different medications for T.T.'s behavioral and mental health problems were prescribed by Dr. Hebert.  On September 4, 2007, Strattera was prescribed.[21]  On

---

[17]     Rec. Doc. 7-1 at 280.

[18]     "Attention deficit hyperactivity disorder (ADHD) symptoms include inattentiveness, hyperactivity and impulsiveness and may cause problems at home, school and in relationships." WebMD, http://www.webmd.com/add-adhd/childhood-adhd/default.htm (last visited Aug. 8, 2013).

[19]     Rec. Doc. 7-1 at 279.

[20]     Rec. Doc. 7-1 at 278.

[21]     Rec. Doc. 7-1 at 428.

-4-

January 30, 2008, both Strattera and Risperdal were prescribed.[22]  On May 13, 2008, Daytrana had replaced Strattera and Risperdal.[23]  On October 27, 2009, T.T. was taking Vyvanse and Celexa.[24]  On December 28, 2009, Intuniv was prescribed.[25]  On January 7, 2010, Adderall was prescribed.[26]  On February 4, 2010, Vyvanse was added to the Adderal.[27]  Later that year, Clonidine was added.[28]

On February 4, 2007, T.T.'s teacher wrote a note explaining that T.T. was repeating kindergarten but is capable of doing well in school.  She stated that "when she IS on medication. . . her behavior is less of a problem" but "[w]hen she does not take her medication, she is unable to perform at school at the level she is quite capable of."[29]

---

[22]    Rec. Doc. 7-1 at 427.

[23]    Rec. Doc. 7-1 at 426.

[24]    Rec. Doc. 7-1 at 442.

[25]    Rec. Doc. 7-1 at 443.

[26]    Rec. Doc. 7-1 at 443.

[27]    Rec. Doc. 7-1 at 443.

[28]    Rec. Doc. 7-1 at 261.

[29]    Rec. Doc. 7-1 at 184 (emphasis in original).

On June 7, 2007, T.T. was evaluated by Sandra B. Durdin, Ph.D., a clinical psychologist.[30]   At that time, T.T. was six years old, and her brother had not yet committed suicide.  Dr. Durdin reviewed no records, and she saw T.T. only on one occasion.  The history provided by T.T. and her mother indicated that T.T. comes from a family with mental health issues, has witnessed domestic violence, "is an angry child," "has been in a chaotic environment," has been diagnosed with ADHD (although Dr. Durdin opined that "[s]he did not show any signs of ADHD today"), has been prescribed Seroquel and Strattera, repeated kindergarten, was referred to the District Attorney's office for truancy, was attending group counseling sessions two nights a week at New Way, remains angry and defiant despite being on medication, throws tantrums, hits herself, hits others, fears nothing, and took a knife to school. Dr. Durdin concluded that T.T. is "primarily angry and oppositional" and diagnosed T.T. with "adjustment reaction with disturbance of conduct disruptive behavior disorder, NOS."

In addition to being treated by her pediatrician, Dr. Hebert, T.T. treated, from 2007 through 2009,  with a psychologist and a counseling team with New Way Mental Health Resources, L.L.C.

---

[30]    Dr. Durdin's report is found in the record at Rec. Doc. 7-3 at 302-304.

On March 24, 2007, T.T. was seen by Dr. Oladapo Folarin, with New Way,[31] who diagnosed her with an adjustment disorder, increased her Strattera prescription, and added Seroquel to her medication regimen.[32]  On June 20, 2007,[33] Dr. Folarin diagnosed T.T. with an adjustment disorder, ADHD, and ODD.[34]  On September 12, 2007,[35] Dr. Folarin noted that T.T.'s Seroquel prescription was not renewed by Dr. Hebert.  He recommended that Risperdal be started and the Strattera dosage be increased.  His diagnosis was "adjustment disorder with mixed disturbance of emotions and conduct, ADHD combined, oppositional defiant disorder, r/o [rule out] intermittent explosive disorder."  At that time, T.T.'s parents were going through a divorce.  Her mother reported that there was some improvement with lessening of her hyperactivity and distractibility, but that T.T. remained defiant, oppositional, and at

---

[31]     Rec. Doc. 7-1 at 510-511.

[32]     It appears that both Dr. Hebert and Dr. Folarin prescribed medications for T.T., although there is also some evidence that Dr. Folarin may have recommended the medications while Dr. Hebert actually prescribed them.  See Rec. Doc. 7-1 at 60, 261, 277, 513-518, 438, 443.

[33]     Rec. Doc. 7-1 at 314.

[34]     "ODD is a condition in which a child displays an ongoing pattern of uncooperative, defiant, hostile, and annoying behavior toward people in authority."  WebMD, http://www.webmd.com/mental-health/oppositional-defiant-disorder (last visited Aug. 8, 2013).

[35]     Rec. Doc. 7-1 at 509.

times physically threatening.  Dr. Folarin saw T.T. again on October 24, 2007,[36] and April 2, 2008.[37]

At the April 2008 appointment, Dr. Folarin noted that T.T.'s symptoms had worsened since her brother's suicide.  He also noted that she was avoiding eye contact, exhibited psychomotor retardation, and delayed responding to his questions. Her mother reported that T.T. continued to be easily aggravated, angry, and at times outright aggressive.  Dr. Folarin recommended an increase in Strattera and starting Prozac Liquid.  His diagnosis was depressive disorder NOS, ADHD combined, oppositional defiant disorder, r/o [rule out] intermittent explosive disorder.

On July 2, 2008, Dr. Folarin again saw T.T.[38]  He complained that T.T.'s mother had failed to bring T.T. in for consistent follow-up visits.  He also noted that T.T.'s primary care physician had changed her from Strattera to a Daytrana patch because T.T.'s mother had to fight with T.T. to get her to take the medicine.  Mrs. Trahan had also stopped the Prozac liquid for unspecified reasons.  T.T. was still "very defiant and oppositional."

---

[36]     Rec. Doc. 7-1 at 508.

[37]     Rec. Doc. 7-1 at 507.

[38]     Rec. Doc. 7-1 at 506.

On July 31, 2008, when T.T. was seven years old and in the second grade, mental health care professionals at New Way Mental Health Center evaluated her using the Child and Adolescent Level of Care Utilization System ("CALOCUS.")[39] At that time, T.T. was taking Risperdal and Strattera.  She was described as having average to high average intelligence but being severely withdrawn, hostile, mistrustful, agitated, depressed, angry, irritable, resistant, impulsive, and aggressive. She had begun cutting her arms and legs "in order to alleviate some of her internal pain."  It was noted that she rarely looked people in the eye, argued with anyone who did not agree with her "until the point that it becomes a volatile situation," is very angry, becomes defiant any time she deals with an authority figure, is extremely aggressive toward her younger brother and her peers, "constantly hits her younger brother and recently. . . began trying to choke him."  The report reads:  "[T.T.] is very quick to lose her temper and become aggressive towards her younger brother and mother.  If she does not get what she wants, she will begin screaming and yelling and destroying her belongings.  This past quarter she has gotten into a fight with her younger brother in which she was choking him until her mother intervened."  Fights with her mother and younger brother were occurring on a daily basis and escalating in both frequency and severity.  The recent suicide of T.T.'s brother was identified

---

[39]     Rec. Doc. 7-1 at 319-332.

as the "main barrier to accomplishing her goals."  She had a fight with him just prior

to his suicide, and she blamed herself for his death.  The CALOCUS report also

indicates that T.T. was failing at school and going to have to repeat first grade, but

the mental health professional spoke with the school principal, and the principal

agreed that promoting T.T. to second grade was in her best educational interest.  Her

composite CALOCUS score was 19,[40] with a recommendation for intensive outpatient

services.[41]

T.T. again saw Dr. Folarin on September 17, 2008.[42]  His treatment note for

that date is inconsistent.  While he states that she is "doing very well" on the Daytrana

patch, he also says that it was necessary to reduce the dosage because she was unable

to do well in school on the higher dosage, and she remains withdrawn and easily

agitated, with severe mood swings and irritability.  She also continued to be

aggressive with her younger brother and peers in the neighborhood.

On October 22, 2008,[43] Dr. Folarin noted that although T.T. seemed very happy

in the session, a note from her teacher indicated extreme hyperactivity, restlessness,

---

[40]     Rec. Doc. 7-1 at 331.

[41]     Rec. Doc. 7-1 at 247.

[42]     Rec. Doc. 7-1 at 505.

[43]     Rec. Doc. 7-1 at 504.

and disruptive behavior in class.  Her mother reported her being very defiant and oppositional, and she explained that the Daytrana was discontinued by the pediatrician because T.T. came home from school very depressed.  The diagnosis was changed to mood disorder NOS, ADHD combined type, oppositional defiant disorder. Dr. Folarin recommended starting Vyvanse and increasing the Risperdal dosage.

On November 19, 2008,[44] T.T. saw Dr. Folarin with her grandmother instead of her mother.  It was noted that her mother is sometimes inconsistent in giving T.T. her medication.  Dr. Folarin also noted that T.T. does well at school on some days but not on others.  In the session, she displayed hyperactivity but no defiant or oppositional behavior.

On December 17, 2008,[45] T.T. again saw Dr. Folarin.  He noted that she was doing better at school but was still defiant at home.

On February 4, 2009, at the age of eight, T.T. was admitted to Crossroads Regional Hospital for inpatient psychiatric treatment, having demonstrated suicidal ideation.[46]  She was diagnosed with major depressive disorder single episode severe without psychotic features and ADHD (predominantly inattentive type).  It was noted

---

[44]     Rec. Doc. 7-1 at 503.

[45]     Rec. Doc. 7-1 at 502.

[46]     Extensive records from this hospitalization are found in the record at Rec. Doc. 7-1 at 341-422.

-11-

that she had unresolved conflict relating to the suicide of her older brother.  Upon admission to the hospital, her GAF score was 25-30.[47]  She was discharged from the hospital on February 11, 2009, with prescriptions for Vyvanse and Celexa, a recommendation to follow up at New Way Mental Health Center, a GAF score of 55,[48] and a fair prognosis.

Following her discharge from the hospital, T.T. saw Dr. Folarin on February 18, 2009.[49]  Her mother reported that she is defiant at times but her depressive symptoms had significantly improved.  Dr. Folarin observed that T.T. was anxious, avoided eye contact, and had some psychomotor retardation.  He assigned a diagnosis of major depressive disorder single episode severe without psychotic features, ADHD (predominantly inattentive type), and unresolved grief.  He advised that she continue taking Celexa, Trazadone, and Vyvanse.

---

[47]    The Global Assessment of Functioning or GAF score is based on a numeric  scale (0 to 100, with 100 indicating no symptoms) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 30-31 (4th ed. 1994) ("DSM–IV"). A GAF score of 25 to 30 indicates behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM–IV at 32.

[48]    A GAF score of 55 indicates moderate symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM–IV at 32.

[49]    Rec. Doc. 7-1 at 501.

On March 4, 2009,[50] Dr. Folarin reported an improvement in T.T.'s condition although she remained defiant at times.

On May 6, 2009,[51] Dr. Folarin again saw T.T.  During the session, she was irritable, defiant, and oppositional.  She was also continuing to exhibit depressive symptoms, although they were not as severe as earlier.  Dr. Folarin recommended reducing her Vyvanse dose, continuing the Trazodone until the end of the school year, and increasing the Celexa dosage.

On July 1, 2009,[52] T.T.'s mother brought her to see Dr. Folarin a month ahead of her scheduled appointment because T.T. had been defiant, hyperactive, oppositional, and restless.  In the session, she was fidgety and restless.  Dr. Folarin recommended that her Vyvanse be restarted.

T.T. returned to see Dr. Folarin on August 19, 2009.[53]  He noted that T.T. is doing well on her current dose of Vyvanse although she is sometimes withdrawn, defiant, and mildly aggressive when upset.

---

[50]    Rec. Doc. 7-1 at 500.

[51]    Rec. Doc. 7-1 at 499.

[52]    Rec. Doc. 7-1 at 498.

[53]    Rec. Doc. 7-1 at 497.

By October 2, 2009, when T.T. was nine years old and in the third grade, she was being provided special education services because of medical diagnoses of ADHD, ODD, and IED.[54]

On October 21, 2009,[55] T.T. again saw Dr. Folarin.  Her grades had deteriorated to Ds and Fs, she was less attentive at school, she had been kicking other students, she was disrespectful and defiant at home, and she was exhibiting increasingly aggressive behavior toward her younger brother.   Dr. Folarin recommended increasing both the Vyvanse and the Celexa "to target irritability and underlying depression."

Dr. Folarin again saw T.T. on December 16, 2009.[56]  She was losing weight and experiencing insomnia.  Her mother asked about taking T.T. off the Vyvanse, since her mood is better when she is off the medication but her school performance worsens.  During the session, she was sad and withdrawn, avoided eye contact, and exhibited psychomotor retardation.  Dr. Folarin recommended reducing the Vyvanse, starting Intuniv, and increasing the Celexa.

---

[54]    Rec. Doc. 7-1 at 259-260.   "IED" stands for intermittent explosive disorder. "Intermittent explosive disorder involves episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which you react grossly out of proportion to the situation."  Mayo Clinic, http://www.mayoclinic.com/health/intermittent-explosive-disorder (last visited Aug. 8, 2013).

[55]    Rec. Doc. 7-1 at 496.

[56]    Rec. Doc. 7-1 at 495.

-14-

On January 7, 2010,[57] T.T.'s third grade teacher wrote that T.T. has had "a dramatic increase in disruptive and aggressive behavior" after being started on new medication, resulting in her being removed from the classroom for the majority of the school day.

On March 4, 2010, Gail Gillespie, Ph.D., a licensed psychologist, summarized the services that she provided to T.T. from November 23, 2009 through December 18, 2009, for a total of twelve visits.[58] She explained that T.T. had previously been in treatment through New Way Mental Health for approximately three years "and made very little progress." She further explained that "little progress was made here in my office as well." She referred T.T. to Crowley Mental Health for more intensive treatment. T.T. presented a flat affect and was largely unresponsive in sessions with Dr. Gillespie but remained very aggressive with her little brother. Dr. Gillespie said: "Although on Vyvanse her mood is agitated in the afternoons, it is the best medication to date for her school progress, and her behavior has much improved on Vyvanse at school."

---

[57]     Rec. Doc. 7-1 at 453.

[58]     Dr. Gillespie's records are found at Rec. Doc. 7-1 at 447-474.

T.T. was seen at Crowley Mental Health Center from February 5, 2010 through July 12, 2010.[59]  A psychiatric evaluation conducted on February 5, 2010,[60] indicates that T.T. was diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder (historically).  She was assigned a GAF score of 45.[61]  A psychosocial assessment conducted the same day,[62] indicates that T.T. was disruptive and defiant at home and at school, was failing at school for refusing to do her school work, had temper tantrums, yells, screams, hits, kicks, bites herself and others, and runs away during tantrums that occur approximately every other day.  The assessment also indicated that T.T. has difficulty making and keeping friends, does not get along with her mother or brother, and experienced a recent drop in grades.  At that time, she was taking only Adderall.

---

[59]     Rec. Doc. 7-1 at 520.

[60]     Rec. Doc. 7-1 at 479-486.

[61]     A GAF score of 45 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM–IV at 32.

[62]     Rec. Doc. 7-1 at 487-491.

-16-

On February 8, 2010, it was recommended that T.T.'s Adderall be discontinued and her Vyvanse dosage be increased.[63]  On July 19, 2010, Clonidine was added to T.T.'s medication regimen because she was unable to sleep at night.[64]

## ASSIGNMENT OF ERRORS

Mrs. Trahan argues that the Commissioner's ruling is erroneous for two reasons:  (1) because the ALJ found that T.T. has one or more severe impairments but failed to identify them; and (2) because the ALJ's finding that T.T. has less than a marked limitation in the domain of interacting and relating well with others is not supported by substantial evidence.

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision that the claimant is not disabled is limited to determining whether the decision was supported by substantial evidence and whether the proper legal standards were applied in reaching the decision.[65]  If the Commissioner's findings are supported by substantial evidence and the decision comports with relevant law, the decision must be affirmed.[66]  Substantial

---

[63]     Rec. Doc. 7-1 at 492.

[64]     Rec. Doc. 7-1 at 261.

[65]     42 U.S.C. § 405(g); *Alfred v. Barnhart*, 181 Fed. App'x 447, 449 (5th Cir. 2006); *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[66]     *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

-17-

evidence is more than a mere scintilla and less than a preponderance.[67]  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.[68]  Finding substantial evidence does not involve a search of the record for isolated bits of evidence that support the Commissioner's decision; instead, the entire record must be scrutinized as a whole.[69] The court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.[70]  A claimant has the burden of proving his disability.[71]

## CHILDHOOD DISABILITY BENEFITS

An individual under age eighteen is considered to be disabled if she has a medically determinable physical or mental impairment resulting in marked and severe functional limitations that is expected to result in death or has lasted or is expected to last for a continuous period of not less than twelve months.[72]

---

[67]   *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

[68]   *Boyd v. Apfel,* 239 F.3d at 704.

[69]   *Singletary v. Bowen*, 798 F.2d at 823.

[70]   *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

[71]   See *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).

[72]   42 U.S.C. § 1382c(a)(3)(C)(I); 20 C.F.R. § 416.906.

A three-step process is utilized to determine whether a person under the age of eighteen is disabled.[73]   At step one, it must be determined whether the claimant is engaging in substantial gainful activity.   A child claimant who is engaging in substantial gainful activity will be found not disabled regardless of her medical condition, age, education, or work experience.[74]

At step two, it must be determined whether the claimant has a medically determinable impairment or a combination of medically determinable impairments that is severe.   A child found to have a slight abnormality or a combination of slight abnormalities that cause no more than minimal functional limitations will be found not disabled.[75]

At step three, it must be determined whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing or that functionally equals a listing.[76]   When the impairments do not meet or equal a listed impairment, the Commissioner will evaluate the functional limitations caused by the child's impairments to determine whether they are disabling.[77]

---

[73]      20 C.F.R. § 416.924; *Lopez v. Barnhart*, 176 Fed. App'x 618, 619 (5th Cir. 2006).

[74]      20 C.F.R. § 416.924(b).

[75]      20 C.F.R. § 416.924(c).

[76]      20 C.F.R. § 416.972.

[77]      20 C.F.R. § 416.926a.

-19-

## DISCUSSION

In her ruling, the ALJ explained the required three-step sequential process for determining whether T.T. is disabled but failed to properly follow it.

At step one, the ALJ found that T.T. has not engaged in substantial gainful activity at any relevant time.[78]  This finding is supported by the record, which establishes that T.T. was only ten years old at the time of the ALJ's ruling.  The record contains no evidence that she has ever engaged in significant physical or mental activities for pay or profit[79] at any time.

At step two, the ALJ found that T.T. "has a medically determinable severe impairment or combination of such impairments."[80]  But the ALJ did not identify that impairment or combination of impairments.

At step three, the ALJ found that "the claimant's condition does not meet or medically equal the criteria for any impairment listed in Appendix 1, Subpart P, Part 404."[81]  But the ALJ did not compare T.T.'s symptoms or the opinions of her physicians and counselors to the criteria of any listing.  Instead, she immediately

---

[78]      Rec. Doc. 7-1 at 18.

[79]      20 C.F.R. § 416.972.

[80]      Rec. Doc. 7-1 at 18.

[81]      Rec. Doc. 7-1 at 18.

moved to a discussion of whether T.T. has an impairment or combination of impairments that are functionally equivalent to a listed impairment.  Thus, in her ruling, the ALJ listed the necessary analytical steps but failed to properly analyze the information found in the record concerning steps two and three.

## A.   THE ALJ ERRED IN FAILING TO IDENTIFY THE SEVERE IMPAIRMENTS

At step two of the required analysis, the ALJ concluded that T.T. "has a medically determinable severe impairment or combination of such impairments."[82] Indeed, T.T. has been diagnosed with ADHD, ODD, adjustment disorders, mood disorders, and depressive disorders.  But the ALJ did not identify any of those disorders as being among T.T.'s severe impairments, nor did the ALJ identify in any way the source of the severe impairment or combination of impairments that the ALJ found to exist.  An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[83]  The ALJ's failure to explain the basis for her step two finding constitutes a serious error that usually precludes meaningful judicial review.

The error at step two was compounded at step three.  There, the ALJ did not compare T.T.'s symptoms or her doctors' findings and opinions to the criteria of any

---

[82]    Rec. Doc. 7-1 at 18.

[83]    *Williams v. Astrue*, No. 09–0130, 2010 WL 989216, at *3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

-21-

listed impairments in an effort to determine whether her condition meets or medically equals the criteria for any impairment.  Instead, the ALJ immediately proceeded to conduct a functional evaluation, again without ever referring to any listed impairment or the criteria necessary to satisfy any listed impairment.

In *Audler v. Astrue*, the ALJ summarily concluded that "[t]he medical evidence indicates that the claimant has . . . impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P,. . . ."[84]  The ALJ did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment.  The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review."[85]

The government argues, however, that the ALJ's failure to identify the claimant's severe impairments was not reversible error because "procedural

---

[84]     501 F.3d 446, 448 (5th Cir. 2007).

[85]     *Audler v. Astrue*, 501 F.3d at 448, quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

perfection in administrative proceedings is not required,"[86] further noting that the prior ALJ had found that T.T. had severe impairments of ADHD and ODD.[87]

Although an ALJ is not required "to do an exhaustive point-by-point discussion" of the evidence offered in support of a claimant's disability claim, an ALJ is required to identify the listed impairment for which the claimant's symptoms fail to qualify, discuss the evidence, and explain how she reached the conclusion that the claimant's symptoms are insufficiently severe to meet any listed impairment.[88]  In this case, however, the ALJ offered nothing to support her preliminary conclusion that T.T.'s condition does not meet or medically equal the criteria for any impairment. She did not even state what listings she considered.  In such a situation, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."[89]

Accordingly, the undersigned would ordinarily be unable to determine whether the Commissioner's conclusion at step two or her preliminary conclusion at step three is or is not based on substantial evidence.  However, the prior ALJ found that the

---

[86]     *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

[87]     Rec. Doc. 7-1 at 102.

[88]     *Audler v. Astrue*, 501 F.3d at 448.

[89]     *Audler v. Astrue*, 501 F.3d at 448, quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

-23-

claimant had two severe impairments:  ADHD and ODD.[90]  He also found that neither impairment or combination of impairments meets or medically equals a listed impairment.[91]  Nothing in the record indicates that T.T. no longer has these conditions or that the severity of the impairments resulting from these conditions has changed significantly since the first ALJ's ruling.  If anything, she has additional conditions that have been diagnosed since the first ALJ rendered his ruling, including major depressive disorder.  Therefore, it is reasonable to conclude that the second ALJ's reference to severe impairments was a reference to, at minimum, the same severe conditions that the first ALJ identified.   The undersigned therefore finds that substantial evidence in the record supports a finding that T.T. has two conditions that cause severe impairments:  ADHD and ODD.

### B.   THE ALJ ERRED IN FINDING LESS THAN A MARKED LIMITATION IN THE DOMAIN OF INTERACTING AND RELATING WITH OTHERS

To show that her impairments are functionally equal to a listed impairment, a child claimant must establish that she has a "marked" limitation in two broad areas of functioning, also known as "domains," or an "extreme" limitation in one domain.[92] A marked limitation in a domain exists when the impairment interferes seriously with

[90]     Rec. Doc. 7-1 at 102.

[91]     Rec. Doc. 7-1 at 102.

[92]     20 C.F.R. § 416.926a.

the claimant's ability to independently initiate, sustain, or complete activities.[93]  A marked limitation is more than moderate but less than extreme.[94]  An extreme limitation in a domain exists when the impairment interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities.[95]

The domains used to assess childhood disability are:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving around and manipulating objects; (5) caring for oneself; and (6) health and physical well being.[96]

In her ruling, the ALJ reviewed the evidence presented regarding T.T.'s functioning in each of the six domains, and she concluded that T.T. has no limitation in four of the domains: acquiring and using information, moving about and manipulating objects, caring for herself, and physical well-being.[97]  The ALJ also found that T.T. has less than a marked limitation in two domains:  attending and completing tasks and interacting and relating well with others.[98]  Mrs. Trahan argues

---

[93]     20 C.F.R. § 416.926a(e)(2)(I).

[94]     20 C.F.R. § 416.926a(e)(2)(I).

[95]     20 C.F.R. § 416.926a(e)(3)(I).

[96]     20 C.F.R. § 416.926a(a)(1)(i)-(vi).

[97]     Rec. Doc. 7-1 at 23.

[98]     Rec. Doc. 7-1 at 20, 22, respectively.

that the ALJ erred in failing to find that T.T. has an extreme limitation in the domain of interacting and relating well with others.

The only way the ALJ could reach the conclusion that T.T. had less than a marked limitation in the domain of interacting and relating well with others was by picking and choosing isolated positive comments from the record and ignoring the overwhelming weight of the evidence in the record.  For example, the ALJ notes that, in one treatment note, Dr. Folarin opined that T.T. was "doing very well" on the then-current medication.  What that treatment note also said was that it was necessary to reduce the dosage of the medication because T.T. was unable to do well in school on the higher dosage, that she remained withdrawn and easily agitated, that she continued to have severe mood swings and irritability, and that she continued to be aggressive with her younger brother and peers in the neighborhood.[99]  The ALJ clearly chose to rely on the one positive aspect of the treatment note and to ignore the negative aspects.[100]  This is just one example of the ALJ picking and choosing the

---

[99]      Rec. Doc. 7-1 at 505.

[100]      Another example of the ALJ's choosing to discuss only certain bits of positive evidence while disregarding equally relevant negative evidence is found in her discussion of T.T.'s academic performance.  She notes that "the claimant's academic performance has been more or less consistent and quite good." (Rec. Doc. 7-1 at 22).  This ignores the fact that T.T. has been afforded special education services (Rec. Doc. 7-1 at 259-260), failed kindergarten (Rec. Doc. 7-1 at 287), would have failed first grade but for intervention by her mental health counselor (Rec. Doc. 7-1 at 324), and was failing at school in the most recent records (Rec. Doc. 7-1 at 487).

evidence that supports a finding of nondisability while omitting from consideration any contrary evidence.  The jurisprudence is clear, however, that an "ALJ must consider *all* the record evidence and cannot 'pick and choose' only the evidence that supports his position."[101]

The record clearly documents the fact that T.T. has been unable to interact and relate well with her mother, her younger brother, her neighbors, or her schoolmates on a consistent basis at any time since 2005.  The ALJ found that although T.T. has had "some social conflicts and behavioral abnormalities. . . [she] possesses the capability to normalize her behavior through the use of medication and behavioral therapy."[102]  That statement is not supported by the evidence in the record.  To the contrary, the record documents the failure of a variety of medications and mental health therapies to make a sustained change in T.T.'s interpersonal difficulties or to normalize her behavior.  In March 2010, when T.T. was nine years old, Dr. Gillespie reported that three years of therapy with New Way resulted in "very little progress."[103] Dr. Gillespie's own efforts during twelve counseling sessions over a two month time

---

[101]     *Loza v. Apfel*, 219 F.3d 278, 393 (5th Cir. 2000) (emphasis added).

[102]     Rec. Doc. 7-1 at 23.

[103]     Rec. Doc. 7-1 at 447.

period also resulted in "little progress."[104]  Having failed to provided T.T. with needed improvement, Dr. Gillespie referred T.T. to Crowley Mental Health for more intensive treatment.[105]  The records from Crowley Mental Health show that, at the conclusion of a five month treatment period, T.T. remained in need of "individual counseling to improve her social skills, learn positive coping skills, and to learn more appropriate ways to deal with her anger and frustration" as well as family counseling to reduce oppositional and disrespectful behavior and medication management to reduce ADHD symptoms and improve her grades and behavior at school.[106]  There is nothing in the records from Crowley Mental Health that shows an improvement in T.T.'s condition during the treatment period.

The ALJ also opined that "the bulk of the difficulty has been due to the claimant's mother and her failure to be compliant in seeing that the claimant is adherent to treatment."[107]  While the record does contain infrequent mentions of problems with medication compliance, there is no evidence in the record that Mrs. Trahan ever willfully refused to be compliant with treatment nor is there evidence in

---

[104]     Rec. Doc. 7-1 at 447.

[105]     Rec. Doc. 7-1 at 447.

[106]     Rec. Doc. 7-1 at 520.

[107]     Rec. Doc. 7-1 at 23.

-28-

the record that T.T.'s behavior would be normalized or that her diagnosed conditions would be remedied if she simply adhered to a strict compliance with the prescribed medication. To the contrary, the record documents numerous changes in prescribed medication and in the dosages of those medications without successfully correcting T.T.'s mood swings, aggressive behavior, oppositional behavior, depressive behavior, temper tantrums, or ADHD symptoms. No prescribed medication has effectively corrected T.T.'s behavioral problems. Moreover, there has been no combination of medication and other treatments that has resulted in sustained improvement in T.T.'s condition. The Fifth Circuit has held that a "medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."[108] In this case, however, no treatment has been identified that reasonably remedies T.T.'s conditions. Therefore, the ALJ cannot validly premise a denial of disability status on an alleged failure to strictly follow the prescribed medication protocol.

The ALJ did not fully or fairly evaluate the evidence in the record in concluding that T.T. has a less than marked limitation in the domain of interacting with and relating to others. Thus, her decision is not supported by substantial

---

[108]     *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). See also *Epps v. Harris*, 624 F.2d 1267, 1270 (5th Cir. 1980) (conditions controlled or controllable by treatment are not disabling).

evidence, and the undersigned finds that the record supports a finding that T.T. has an extreme limitation in the domain of interacting and relating well with others.

## CONCLUSION AND RECOMMENDATION

Having found that the Commissioner's decision is flawed in two very significant ways, the only remaining issue left to decide is whether to reverse and remand for further proceedings before the ALJ or for an award of benefits.  The fourth sentence of 42 U.S.C. § 405(g) provides that "[t]he [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  When an ALJ's decision is not supported by substantial evidence, and the uncontroverted evidence clearly establishes the claimant's entitlement to benefits, the case may be remanded with the instruction to make an award of benefits.[109]  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.[110]

In this case, benefits are sought from January 12, 2008, a date that coincides with this little girl, who had already been diagnosed with ADHD, ODD, and an

---

[109]      See *Taylor v. Bowen*, 782 F.2d 1294, 1298–99 (5th Cir. 1986).

[110]      See, e.g., *Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985).

adjustment disorder, witnessing her brother's body shortly after his suicide attempt and before his death.  She was hospitalized for severe depression with suicidal ideation a year later at the age of eight.  The record clearly establishes that the treatments tried thus far – prescription medications, outpatient counseling, and even inpatient counseling – have failed to result in a sustained improvement in T.T.'s condition.

Furthermore, Mrs. Trahan has been seeking benefits for T.T. since 2007, when T.T. was six years old.  She will have her thirteenth birthday next month.  Two hearings have been held, two adverse rulings have been issued by ALJs, even after the Appeals Council ordered the case to be heard again.  One of the errors made by the ALJ's most recent decision was a failure to comply with a procedural requirement (failing to identify the claimant's severe impairments) that can be overcome by reference to the earlier ruling.  The second more serious error in the most recent ruling was a failure to take into account all the evidence in the record, resulting in a decision that was not supported by substantial evidence.

When an ALJ's decision is not supported by substantial evidence, the case may be remanded with instructions to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits.  This is such a case.  Substantial evidence in the record supports a finding that T.T.'s severe impairments

(or a combination thereof) functionally equal a listing.  Furthermore, it would not be in the best interest of the claimant, nor would it serve justice, to remand the case for further proceedings.[111]  Accordingly, the undersigned recommends that this case be remanded to the Commissioner for an award of benefits in the plaintiff's favor.

The undersigned fully reviewed the entire record on this matter, finds that the Commissioner erred in reaching the final decision in this matter, finds that the Commissioner failed to apply the proper legal standards in reaching the decision, and finds that the decision was not supported by substantial evidence.

Accordingly, the undersigned recommends that this case be REMANDED to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g), with instructions that the application for Supplemental Security Income be granted and for computation and payment of an award of benefits beginning January 12, 2008.

---

[111]     See. e.g., *Shugart v. Astrue*, No. 3:12-CV-01705-BK, 2013 WL 991252, at *6 (N.D. Tex. Mar. 13, 2013) (reversing and remanding for an award of benefits where the ALJ erred in determining the plaintiff's residual functional capacity and the case had been pending for seven years, been before an ALJ three times, and the record consists of nearly 2,000 pages); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (remanding for an award of benefits where case had been pending for over eight years, and the ALJ had relied on the wrong medical record in denying benefits); *Jimmerson v. Apfel*, 111 F.Supp.2d 846, 850–51 (E.D. Tex. 2000) (reversing and remanding for an award of benefits where the ALJ's decision was not supported by substantial evidence, the case had been remanded twice before, and the plaintiff's claim had been pending for eight years).

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[112]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d

---

[112]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

1415 (5th Cir. 1996).


Signed in Lafayette, Louisiana, this 14th day of August 2013.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE